When recorded mail to:

Robert Mehlhaff
MEHLHAFF & HAY
Attorneys at Law
23950 S. Chrisman Road, Ste. A
P.O. Box 1129
Tracy, CA 95378-1129
Telephone:  209-835-3232

McGREGOR W. SCOTT
United States Attorney
YOSHINORI H. T. HIMEL
Assistant U. S. Attorney
501 I Street, Suite 10-100
Sacramento, California 95814
Telephone:  916-554-2760

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WHITE LAKE MUTUAL WATER CO., | CIV. S-04-2565-LKK/DAD |
| Plaintiff, | **STIPULATION AND ORDER FOR COMPROMISE SETTLEMENT** |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendant; | |
| UNITED STATES OF AMERICA, | |
| Counterclaimant, | |
| v. | |
| WHITE LAKE MUTUAL WATER CO., | |
| Counterclaim Defendant. | |

WHITE LAKE MUTUAL WATER COMPANY, plaintiff and counterclaim defendant

("WLMWC"), and the UNITED STATES OF AMERICA, defendant and counterclaimant

("United States"), as the parties to the above-captioned action ("Parties"), through their

1

1   undersigned attorneys, hereby agree and stipulate, subject to the approval of the Court as

2   provided for hereon, as follows:

3        1.  The Parties enter into this agreement to establish a formula for cost sharing for the

4   operation and maintenance of certain drainage ditch segments and related facilities that handle

5   agricultural drainage from the service area of WLMWC and that are the subjects of reciprocal

6   drainage easements affecting the titles to the properties conveyed by the deed transfers

7   referenced in Appendix A hereto.  The properties affected by the drainage easements consist

8   of properties conveyed by Burkhard Investment Company through intermediate transferees to

9   WLMWC (Appendix A, paragraph (a)) and to the United States (Appendix A, paragraph (b)),

10  the latter property being administered by the Fish and Wildlife Service, an agency of the

11  Department of the Interior.

12       2.  Definitions:  The "Boundary Ditch" is a drainage ditch segment whose center line is

13  described in Appendix B hereto.  The "Lower Ditch" is a drainage ditch segment whose upper

14  end is the lower end of the Boundary Ditch and whose center line is described in the

15  approximate courses in Appendix C hereto.  The "Terminal Pumping Station" is located at the

16  downstream terminus of the Lower Ditch; its two pumps and gravity drain convey drainage

17  waters at that location through a levee, to sloughs connecting to the San Joaquin River.

18  "Cleaning" of ditches means removal of unconsolidated materials.

19       3.  The parties contemplate that the Boundary Ditch and the Lower Ditch can be

20  operated in a manner that accommodates the drainage from the WLMWC service area without

21  any widening of the ditches beyond their present width.  To the extent that operation in this

22  manner ceases to be possible, this agreement is subject to reopening and may be modified as

23  herein provided.

24       4.  Cleaning of the Boundary Ditch and Lower Ditch, which is anticipated to occur

25  some time during the months of May through September, as well as preventive and corrective

26  maintenance on the Terminal Pumping Station, will be scheduled solely by the United States.

27  During any calendar year the United States will determine whether unconsolidated materials

28  are obstructing ditch flow and may, in its discretion, forego cleaning.  If WLMWC disputes

2

the decision of the United States to forego cleaning and asserts that unconsolidated materials are obstructing ditch flow to the degree that cleaning is required, and if the matter cannot be resolved by negotiation within a reasonable time up to one month following written request by WLMWC for such cleaning, then the Parties shall proceed to resolve the dispute as provided in paragraph 23, below.

5. The costs of operating and maintaining the Boundary Ditch, the Lower Ditch and the Terminal Pumping Station, incurred from 2003 until further order of this Court or further written agreement of the Parties, shall be borne by the Parties in the following proportion: Forty-Four Percent (44%) by WLMWC, and Fifty-Six Percent (56%) by the United States.

6. Except for the Boundary Ditch and Lower Ditch defined above, WLMWC hereby forever releases and waives all claims of easements or rights to drain across the land owned by the United States and conveyed in the instruments listed in Appendix A, paragraph (b), hereto. WLMWC shall hold harmless, indemnify and defend the United States from any claim, by it or anyone else, for costs of operation and maintenance of any drainage ditch or facility located on any of the property conveyed in the instruments listed in Appendix A, paragraph (a), hereto.

7. Except as provided for herein, the United States forever releases and waives any claims for costs of operation and maintenance of the Boundary Ditch, Lower Ditch and Terminal Pumping Station defined above.

8. Except as provided for herein, WLMWC shall not be liable to the United States for any costs of operation and maintenance of any drainage ditch or facility located on any of the federal property conveyed in the instruments listed in Appendix A, paragraph (b), hereto.

9. Operation and maintenance costs for the Boundary Ditch, the Lower Ditch and the Terminal Pumping Station have been incurred but not billed by the United States during calendar years 2002, 2003, 2004 and 2005. The manner in which WLMWC shall pay its 44% share of those costs is as follows: The United States has presented to WLMWC evidence of 2002, 2003 and 2004 expenditures by it totaling $54,300, and requests the 44% sharing as to costs totaling $52,249. The United States will forego reimbursement of 2002 costs attributed

3

1   to employee labor and services.  The United States may present evidence of further such

2   expenditures incurred between January 1, 2005, and the filing date of the Order filed by the

3   Court approving this stipulation (hereinafter, "Order"; "pre-Order").  WLMWC may verify

4   that the expenditures reflected therein are in fact related to operation and maintenance of the

5   Boundary Ditch, the Lower Ditch or the Terminal Pumping Station.  To pay WLMWC's 44%

6   share of such verified 2003, 2004 and pre-Order 2005 expenditures, WLMWC shall, upon

7   request by the United States, pay operation and maintenance costs incurred on or after the

8   filing date of the Order, directly and in full, until the cumulative total paid under this term by

9   WLMWC reaches 44% of the sum of the cumulative verified 2003, 2004 and pre-Order 2005

10   expenditures by the United States plus 44% of the operation and maintenance costs incurred

11   on or after the filing date of the Order.

12       10.  After the filing date of the Order, the Parties contemplate that the United States

13   will perform or arrange for the performance of all of the operation and maintenance work

14   done on the Boundary Ditch, the Lower Ditch and the Terminal Pumping Station.  Upon

15   request, WLMWC shall pay its 44% proportionate share of the cost thereof.

16       11.  The United States may, to the extent it deems necessary, remove any beaver dams

17   obstructing the Boundary Ditch or the Lower Ditch.  The United States shall not request

18   reimbursement therefor.  WLMWC shall not remove any beaver dams on the Boundary Ditch

19   but may request that the United States remove beaver dams.  If WLMWC disputes the

20   decision of the United States not to remove a beaver dam, and asserts the beaver dam is

21   obstructing ditch flow to the degree that removal is required, and if the matter cannot be

22   resolved by negotiation within a reasonable time up to one month following written request

23   for such removal by WLMWC, then the Parties shall proceed to resolve the dispute as

24   provided in paragraph 23, below.

25       12.  Each of the Parties shall designate a person to serve as a point of contact, and the

26   designated persons shall confer not later than May of each year on operation and maintenance

27   work to be done, scheduling, and disposal arrangements for sediments and spoil.  Should the

28

1  annual conference not take place, the lack of the annual conference shall not affect any rights

2  of the Parties hereunder.

3          13.  The sediments and spoil removed from the Boundary Ditch during annual

4  maintenance shall be placed at locations designated and agreed upon by Party representatives

5  during the annual conference.  The locations shall be on the WLMWC side of the property

6  boundary in the next two years in which ditch cleaning is conducted after 2005.  After the

7  second of the two post-2005 years mentioned in the preceding sentence, such sediments and

8  spoil shall be placed on the United States side for the next year in which ditch cleaning is

9  conducted, then alternated between the WLMWC side and the United States side for years in

10  which ditch cleaning is conducted thereafter.

11          14.  If either Party, in its sole discretion, determines that the sediments and spoil

12  removed from the Boundary Ditch or the Lower Ditch by the maintenance contemplated

13  hereunder and placed upon, or to be placed upon, its land is detrimental to its land or land use,

14  it may elect to dispose of such sediments and spoil by hauling it to the nearest place of

15  disposal that will take such sediments and spoil.  If the place of disposal is outside the lands

16  referred to in paragraph 1 hereof, the costs of such hauling and disposal shall be shared in the

17  proportions stated in paragraph 5 hereof.

18          15.  The United States shall not be restricted from taking measures on its property, at

19  its sole expense, to protect habitats from the effects of the drainage in the Boundary Ditch that

20  occurs consistent with this agreement, including but not limited to improving the separating

21  berm, with or without the use of any and all sediments and spoil taken from the Boundary

22  Ditch or the Lower Ditch.

23          16.  Nothing in this agreement shall be construed in a way that limits or restricts the

24  power of the United States or of the Fish and Wildlife Service to discharge fully their

25  responsibilities under applicable law.

26          17.  WLMWC shall hold harmless, indemnify and defend the United States from any

27  actual or alleged liability or responsibility for the quality of the drainage water emanating

28  directly or indirectly from the lands in WLMWC's service area, including any claim of cost of

5

cleanup or remediation related to such drainage water, or damage as a result of such drainage water.

18.   Each Party shall bear its own attorney's fees and costs related to this action.

19.   Each Party hereby agrees to release and discharge the other Party of and from any and all claims, demands, obligations, damages, liabilities, loss, cost or expense of any kind or nature whatsoever, past or present, ascertained or unascertained, whether or not now known, suspected or claimed, that relates to or arises from or is connected to the matters alleged in their respective complaints and counterclaims, except the obligations created by this Stipulation and Order for Compromise Settlement.

20.   This release includes and is intended for the benefit of each of the Parties above-named, and any officers, employees, agents, accountants, attorneys, insurers, or insurance carriers, or any other persons acting for, under, or in connection with such Parties, past or present, and is a release of and from all claims, demands, actions, causes of action, obligations, damages, liabilities, loss, cost or expense, of any kind or nature whatsoever, including court costs and attorney's fees, past or present, ascertained or unascertained, whether or not now known, suspected or claimed, except the obligations created by this Stipulation and Order for Compromise Settlement.

21.   Each Party hereby expressly waives the rights or benefits available under § 1542 of the Civil Code of the State of California, which provides that:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtors.

22.   This Stipulation and Order for Compromise Settlement is the compromise of disputed claims and fully and finally settles all claims between the Parties, and is intended to buy peace and to prevent any further involvement in the above-mentioned dispute.  Neither the payment of any consideration hereunder nor anything contained in this Stipulation and Order for Compromise Settlement shall be interpreted or construed to be an admission on the part of, nor to the prejudice of, any person or party named herein, and each such person or

6

1  party hereto expressly denies any and all liability regarding the dispute or the transactions that

2  gave rise to the dispute.

3       23. The Parties agree that should conflicts, disagreements or grievances arise between

4  the parties concerning the terms or performance of this Agreement, and should good faith

5  negotiation fail to resolve the matter, the Parties shall make good faith efforts to resolve such

6  disputes through informal mediation or, by agreement in writing, through formal mediation,

7  before either Party commences any litigation.

8       24. The Parties understand and agree that this Stipulation and Order for Compromise

9  Settlement shall act as a full and final release of all claims, known or unknown, whether or

10  not asserted, arising from any dispute alleged, or that could have been alleged, in the

11  complaint and counterclaims in the above-entitled action.  Each party fully understands that if

12  the facts in respect to which this Stipulation and Order for Compromise Settlement is

13  executed are found thereafter to be different from the facts now believed by any party

14  described herein to be true, each party expressly accepts and assumes the risk of such

15  possibility and of such different set of facts, and agrees that this settlement agreement and

16  release shall remain effective notwithstanding such difference.

17       25. Implementation of this agreement by the United States is subject to the

18  requirements of the Anti-Deficiency Act, 31 U.S.C. § 1341, and to the availability of

19  appropriated funds.  The expenditure or advance of any money or the performance of any

20  obligation of the United States under this settlement shall be contingent upon appropriation or

21  allotment of funds.  No breach of this agreement shall result and no liability shall accrue to

22  the United States if funds are not appropriated or allotted.  To the extent permitted by law, the

23  San Joaquin River National Wildlife Refuge shall seek the appropriations needed to fulfill the

24  terms of this agreement.

25  ////

26  ////

27  ////

28  ////

26.  This Stipulation and Order for Compromise Settlement shall enure to the benefit of each party hereto, their predecessors, successors, subsidiaries, affiliates, parent-corporations, representatives, assigns, agents, officers, directors, employees, and personal representatives, past, present, and future, as well as anyone else who was or could be liable on the claims that were or could have been raised in the complaint and counterclaim in this action.

27.  This Stipulation and Order for Compromise Settlement contains the entire agreement of the Parties and may not be altered, amended, or modified in any respect, except by a writing duly executed by the Party to be charged.  Further, all prior agreements, undertakings, oral agreements, and writings are expressly superseded hereby and are of no force or effect.

Dated:  November 2, 2005

WHITE LAKE MUTUAL WATER COMPANY

By:   MEHLHAFF & HAY

By:   /s/ Robert Mehlhaff
ROBERT MEHLHAFF
Attorneys for Plaintiff and
Counterclaim Defendant
WHITE LAKE MUTUAL WATER COMPANY

////
////
////
////
////
////
////
////
////
////

1    Dated:  October 31, 2005                    McGREGOR W. SCOTT
                                                 United States Attorney
2
                                           By:   /s/ Y H T Himel
3                                                YOSHINORI H. T. HIMEL
                                                 Assistant U. S. Attorney
4                                                Attorneys for Defendant and
                                                 Counterclaimant
5                                                UNITED STATES OF AMERICA

6    Of Counsel:

7    KAREN D. KOCH
     Assistant Regional Solicitor
8    United States Department of the Interior
     2800 Cottage Way, Room E-1712
9    Sacramento, CA 95825
     Telephone: (916) 978-5687
10   Facsimile: (916) 978-5694

11

12

13                                 ORDER

14

15         It is APPROVED and SO ORDERED.

16   DATED:  November 18, 2005.

17
                                           /s/Lawrence K. Karlton
18                                         LAWRENCE K. KARLTON
                                           SENIOR JUDGE
19                                         UNITED STATES DISTRICT COURT

20

21

22

23

24

25

26

27

28

                                 9

**APPENDIX A**

**Paragraph (a)**:

The deeds from the Burkhard Investment Company ("BURKHARD") to the following persons and recorded at Volume and Page numbers of the Official Records of Stanislaus County, California, as indicated below, who transferred and assigned their water rights and drainage obligations to WLMWC by subsequent the grants and assignments, or who took title subject to a prior transfer of those water rights and drainage obligations to WLMWC, as shown in the recorded documents as indicated below:

> **(i)** to Frank Goulart, a single man, dated 6/30/1941, recorded 7/14/1941, at 735 OR 584 [1] (referring to former BURKHARD field No. 18A); water and drainage rights and obligations transferred to WLMWC by grant and assignment dated 9/13/1941 and recorded 10/30/1941, at 743 OR 279;

> **(ii)** to Jose Alvarez and Lorenza Alvarez, husband and wife, dated 8/27/1941, recorded 10/30/1941, at 740 OR 368 (referring to former BURKHARD fields No. 3, 17 and 9); water and drainage rights and obligations transferred to WLMWC by grant and assignment dated 9/13/1941, recorded 10/30/1941, at 740 OR 370;

> **(iii)** to John J. Pedro and Olive Pedro, husband and wife, dated 8/27/1941, recorded 10/30/1941, at 740 OR 375 (referring to former BURKHARD fields No. 4, 10 and 11N); water and drainage rights and obligations transferred to WLMWC by grant and assignment dated 9/13/1941, recorded 10/30/1941, at 740 OR 377;

> **(iv)** to Fred E. Warner and Gertrude L. Warner, husband and wife, dated 8/27/1941, recorded 10/30/1941, at 743 OR 281 (referring to former BURKHARD field No. 18); water and drainage rights and obligations transferred to WLMWC by grant and assignment dated 9/13/1941, recorded 10/30/1941, at 743 OR 283;

> **(v)** to May Flynn Jones, a widow, dated 8/27/1941, recorded 10/30/1941, at 743 OR 290 (referring to former BURKHARD field 11S); water and drainage rights and obligations transferred to WLMWC by grant and assignment dated 9/13/1941, recorded 10/30/1941, at 743 OR 291; and

> **(vi)** to William R. Lewis and Viva L. Lewis, husband and wife, dated 1/29/1942, recorded 3/13/1942, at 753 OR 44 (referring to former BURKHARD field No. 19); subject to the prior transfer of water and drainage rights by

---

[1] "735 OR 584" indicates the deed recorded at Vol. 735 of the Official Records of Stanislaus County, at Page 584.

1

1   BURKHARD to WLMWC dated 10/15/1941, and recorded
    10/31/1941, at 743 OR 277

2

3

4   **Paragraph (b)**:

5   The deed from BURKHARD to Pietro Rampone, a single man, dated
    6/12/1941, recorded on 7/14/1941 at 735 OR 588; title to which
6   later passed from Rampone to Frank Sarmento and Nancy Rampone
    Sarmento, from the Sarmentos to Edwin E. and Hilma W. Hagemann
7   by deed recorded on 10/1/1965, at 2059 OR 610, and in 1999,
    after Mr. Hagemann died, from his widow and her son (as co-
8   trustee of the testamentary trust contained in Mr. Hagemann's
    will) to the United States of America by deed recorded on
9   1/29/1999 as Doc. No. 99-0009561-00 in the Official Records of
    Stanislaus County, California.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

APPENDIX B

**(Description of Boundary Ditch)**

COMMENCING at the intersection of the centerline of the West Stanislaus Irrigation District's main intake canal, as shown on the map recorded October 29, 1992, in Book 45 of Parcel Maps, at Page 49, in the Office of the Stanislaus County Recorder, with the centerline of West Stanislaus Road right-of-way, which is the most westerly corner of Parcel 2 per Document #103387, Stanislaus County Records; thence leaving said canal centerline and running along the center of the right-of-way, North 45°17'58" East, 173.99 feet, to a 3¼ inch U.S. Fish and Wildlife Service aluminum cap marked "7031, L.S. 4495, 1998", on a #5 rebar on the easterly right-of-way of the West Stanislaus Irrigation District main canal; thence leaving said right-of-way, North 74°41'38" West, 208.99 feet, to a P.K. nail with an aluminum washer marked "7032, L.S. 4495, 1998"; thence South 71°19'06" West, 111.06 feet, to a point on the centerline of the BOUNDARY DITCH, from which a 3¼ inch U.S. Fish and Wildlife Service aluminum cap marked "7033, L.S. 4495, 1998", on a #5 rebar bears South 01°04'31" East, 16.64 feet, and the TRUE POINT OF BEGINNING of this description:

THENCE continuing along the centerline of said BOUNDARY DITCH for the following 29 courses:

```
    North 65°42'49" West, 539.22 feet;
    North 48°45'49" West, 299.08 feet;
    North 44°25'49" West, 382.03 feet;
    North 06°19'49" West, 272.79 feet;
    North 26°39'49" West, 253.39 feet;
    South 89°38'11" West, 314.31 feet;
    North 45°30'47" West,  88.32 feet;
    North 45°40'49" West, 396.85 feet;
    North 21°57'49" West, 366.74 feet;
    North 36°29'49" West, 968.62 feet;
    North 24°52'49" West, 270.15 feet;
    North 28°39'49" West, 332.53 feet;
    North 15°22'49" West, 307.47 feet;
    North 26°39'11" East, 405.69 feet;
    North 04°53'11" East, 479.73 feet;
    North 36°33'48" West, 132.66 feet;
    North 69°12'49" West, 369.19 feet;
    North 67°48'49" West, 198.16 feet;
    North 16°15'49" West, 148.90 feet;
    North 02°12'49" West, 589.47 feet;
    North 11°47'49" West, 256.77 feet;
    North 03°39'49" West, 295.35 feet;
    North 05°58'11" East, 531.75 feet;
    North 23°45'11" East, 520.97 feet;
    North 40°01'11" East, 778.41 feet;
    North 22°32'11" East, 595.99 feet;
```

1

1      North 32°14'10" East, 279.40 feet;
       North 51°56'11" East, 819.84 feet;
2      North 18°34'11" East, 272.57 feet;

3   To the point of termination of the BOUNDARY DITCH.

# APPENDIX C

## (Description of Lower Ditch)

COMMENCING at the point of termination of the BOUNDARY DITCH described hereinabove; thence along the centerline of the LOWER DITCH for the following 14 courses:

South 60°23'51" East, 490.31 feet;
North 04°03'13" West, 137.01 feet;
North 06°58'06" East, 222.15 feet;
North 76°15'49" East, 113.50 feet;
South 86°29'47" East, 120.28 feet;
North 80°32'16" East, 223.55 feet;
North 71°44'14" East, 258.00 feet;
South 80°08'03" East, 285.98 feet;
North 37°39'50" East, 100.24 feet;
North 00°30'58" West, 271.97 feet;
North 44°11'35" East, 246.03 feet;
North 56°21'32" East, 332.55 feet;
North 67°05'39" East, 188.84 feet;
North 37°15'59" East, 141.62 feet;

To the pumping station that pumps said DRAINAGE WATERS into the San Joaquin River or the slough connecting to the San Joaquin River (herein called the "TERMINAL PUMPING STATION")